UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **United States of America** | : | |
| | : | |
| v. | : | **Case No. 3:07cr74 (JBA)** |
| | : | |
| **Linwood Oates.** | : | |

**RULING ON DEFENDANT'S MOTION TO SUPPRESS EVIDENCE [DOC. # 13]**

Defendant Oates, charged with possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1) and § 924(a)(3), moves to suppress (1) a handgun seized on February 27, 2007 after a warrantless search of the glove compartment of the car he was operating; (2) holster and ammunition seized from warrantless search of defendant's apartment conducted following his arrest for possession of the seized handgun; and (3) incriminating statements made by defendant concerning gun possession during an interview conducting in the presence of his attorney on March 2, 2007 following a court appearance. See Mot. to Suppress [Doc. # 13]. Upon submission of an affidavit from defendant attesting that on February 27, 2007 the car he was operating was "stopped for no apparent reason by the New London Police," see Def. Aff. [Doc. # 22] ¶ 3, thus calling into question the validity of any post-stop search of the car and subsequent events, the Court held a hearing on defendant's Motion on July 30 and August 1, 2007. At the hearing, the Government confirmed that it does not intend to offer at any trial the

holster and ammunition seized from defendant's apartment, and thus that portion of defendant's Motion is rendered moot and is not discussed herein. For the reasons that follow, the remainder of defendant's Motion, as to the firearm seized and defendant's subsequent statements, will be denied.

I.  **Factual Background**

On the basis of testimony and documentary evidence submitted at trial, the Court finds the following facts, which are relevant to defendant's Motion.

Shortly before midnight on February 27, 2007, Officer Cornelius Rogers of the New London Police Department observed the defendant driving a white sedan in downtown New London. Upon observing the defendant fail to stop at a stop sign, Officer Rogers activated the lights and siren on his police cruiser and conducted a motor vehicle stop of the vehicle. After stopping the car, Officer Rogers observed movement within the car, specifically, the defendant leaning forward and moving around in the front compartment of the car. Officer Rogers notified dispatch of the stop and additional police officers arrived on the scene as Rogers began to approach the vehicle, including Sergeant Michael Strecker. When Rogers reached the car, he asked defendant why he had been moving about in the car; defendant did not respond. Officer Rogers then ordered the defendant and his passenger, Cedric Balancier, out of the car and conducted a pat-

down of the defendant with his consent.  Around the same time, in response to the defendant's name being mentioned over the radio dispatch, Officer Keating, who was operating the dispatch that night, informed the officers at the scene that a concerned citizen had reported that defendant was in possession of a handgun (referred to by its code name, a "3").

Meanwhile, according to the unrebutted testimony of Officer Rogers and Sergeant Strecker, when asked, defendant consented to a search of the vehicle, stating "go ahead, Cornelius," or words to that effect.  Rogers and Strecker commenced the search, with Rogers searching the driver's side of the vehicle and Strecker searching the passenger's side.  In the course of the search, Strecker found on the front passenger side floorboard a ripped corner of a plastic baggie with a white powder residue, which he testified he knows from his experience and training is used for packaging narcotics, specifically crack cocaine.  He seized this item and continued his search, until he asked Officer Rogers for the car keys (which were still in the ignition) so that he could open the locked glove compartment.  At that point, defendant and Balancier protested, stated that they needed a warrant to search the compartment, and effectively withdrew consent for the search.

Having no consent to search the glove compartment, and given the discovery of the plastic baggie corner which Strecker believed had been used to store narcotics, Strecker requested the

assistance of a narcotics canine, following the policy that a supervisor on the scene can request a canine from the shift commander who will then request the canine from neighboring agencies. In this case, the Waterford Police Department sent Officer Daniel Lane, along with the Department's trained narcotics dog, Blitz. Officer Lane testified that Blitz is certified in detecting cocaine, heroine, and marijuana, that he receives twice-monthly training on the scents of these narcotics, and that he undergoes an annual certification testing process.

Officer Lane described the mechanics of a typical car search with a narcotics canine, and that which occurred in this case. Typically, he first walks the canine around the outside of the car, in a particular progression, and then allows the canine to do a "free search" of the interior of the car, putting the canine in the car free, with doors and windows closed, starting in the rear of the car. If there is an "alert" during the free search, Lane will then conduct a detailed search of all of the panels and compartments in the interior of the car by calling the canine's name, putting his own hand on the compartment to be searched, and saying "check here." Lane usually wears black Nike batting gloves during the entirety of a narcotics search so that his hands are protected if he has to clear out any clutter or contraband. Lane followed this procedure here, taking Blitz around the outside of the car first, and then putting him in the

rear of the vehicle for the free search and giving him the search command ("seek dope").  Lane testified that Blitz began in the back seat and went directly into the front passenger seat and alerted, by scratching, on the glove compartment.  He explained that, in his experience, narcotics canines will respond to both narcotics themselves and traces of narcotics.  At this point, Lane walked to the front passenger door of the vehicle with Strecker, and Strecker asked defendant's mother, who had since arrived at the scene following a cell phone call from the defendant, to also observe Blitz's alert.  Blitz and Lane then commenced a detailed search of the vehicle, and thus at some point towards the end of the search, before the glove compartment was actually opened, Lane touched the compartment with his gloved hand, and Blitz again alerted on it.  Strecker then obtained the key from the ignition and opened the glove box, revealing the firearm that is the subject of defendant's Motion to Suppress, but no narcotics.  The firearm was removed from the glove box and taken into evidence, and Oates and Balancier were placed under arrest and removed from the scene.

    As noted, supra, at some point after the vehicle stop, defendant used his cell phone to contact his mother, Julie Oates, who lived nearby.  At her son's request Mrs. Oates came to the scene, arriving after the additional officers, including Sergeant Strecker, but before Officer Lane and Blitz.  Mrs. Oates

testified that when she arrived no search of the car was in progress, defendant was on his cell phone talking to his girlfriend, and she heard defendant saying that the police officers wanted to search the car but he would not consent, that they needed a warrant, and that they "didn't have the right." A few minutes later she observed the arrival of a Waterford police officer with a dog. Mrs. Oates' account is thus consistent with that of the police officers, and reflects that Mrs. Oates arrived on the scene after the initial search of the car and defendant's withdrawal of consent, but before the arrival of Officer Lane. The remainder of Mrs. Oates' testimony regarding the narcotics dog search of the vehicle is also consistent with the officers' accounts, including her observation of Lane wearing a black leather glove and sliding his hand over the glove compartment; as described above, Lane testified he always wears black gloves when he conducts narcotics searches and the detailed search of an interior of a car involves touching certain compartments to signal to the dog where to search. Moreover, Lane testified that Blitz also alerted on the glove compartment during the free search, even before he used his gloved hand to indicate to Blitz where to search.

Subsequent to his arrest, on March 2, 2007, the defendant, who had been released on bond, appeared at the Connecticut Superior Court in New London with his attorney, Anthony Basilic,

6

and voluntarily met with Special Agent Daniel Prather of the Bureau of Alcohol, Tobacco, Firearms and Explosives and New London Police Department Officer George Potts. Defendant claims in his memorandum that he and his attorney "were advised that anything they said was 'off the record'" and "[n]o Miranda warnings, so-called, were given." Def. Mem. at 4. At the suppression hearing, Prather testified that defendant was informed by Assistant States Attorney Kennedy that the officers were interested in speaking with him about the firearm that had been seized from the vehicle he was operating on February 27, 2007, and that before the meeting began Kennedy explained to the defendant and Attorney Basilic that no promises or threats were being made regarding the disposition of his pending state firearm case, but that any truthful cooperation he provided would be brought to the attention of the state court judge; Agent Prather stated that he reiterated this information to defendant after Kennedy had excused himself from the meeting and before Prather began asking defendant questions. Prather also testified that no proffer agreement was entered into with the defendant, and he denied telling defendant or his attorney that the discussion was "off the record." During the meeting, in which Prather was attempting to gather information about a suspected Maine-New London narcotics-for-firearms criminal venture, the defendant made incriminating statements about his purchase and possession

7

of the seized handgun.

**II.  Handgun Seized from Glove Compartment**

Defendant seeks suppression of the firearm seized from the glove compartment of the car on February 27, 2007 on the basis that "[t]he anonymous tip that the second New London officer relayed to the arresting officer fails to pass muster under the Supreme Court decisions governing anonymous informants" and that "[s]ince [d]efendant was never arrested and charged with the motor vehicle violation, the seizure of the firearm cannot be justified as a search incident to arrest.  Nor can it be justified on the basis of the narcotics sniffing dog 'alerting' the glove compartment where no narcotics were found," contending, "[i]t is pure sophistry to suggest that the dog's training also included sensitivity to guns and gunpowder when there was no reaction to the many armed officers on the scene."  Def. Mem. at 4.

As an initial matter, "an ordinary traffic stop constitutes a limited seizure within the meaning of the Fourth and Fourteenth Amendments [and] [a]ccordingly, such stops must be justified by probable cause or a reasonable suspicion, based on specific and articulable facts, of unlawful conduct."  United States v. Scopo, 19 F.3d 777, 781 (2d Cir. 1994).  "[T]he decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."  Whren v. United

States, 517 U.S. 806, 810 (1996).  Further, under Maryland v. Wilson, 519 U.S. 408 (1997), and Pennsylvania v. Mimms, 434 U.S. 106 (1977), after lawfully stopping a car, a police officer may "as a matter of course" order the driver and passengers to exit the vehicle.  Thus, as defendant offered no evidence disputing Officer Rogers's testimony that defendant ran a stop sign on the night of February 27, 2007, both Officer Rogers's stop of the car and his ordering defendant and the passenger out of the car, were lawful.

Next, the undisputed evidence at the hearing from both Officer Rogers and Sergeant Strecker was that defendant initially consented to the search of the car and thus that search, which uncovered the ripped corner of a plastic baggie with a white powder residue, was lawful until defendant revoked his consent.  At the point of any revocation of consent, as the testifying officers acknowledged, the search could not be lawfully continued absent probable cause to do so.[1]  "Probable cause exists where the facts and circumstances within [the police officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a [person] of reasonable caution in the belief that an offense has been or

---

[1] Search of a glove compartment of a vehicle, if probable cause is shown, falls within the automobile search exception to the warrant requirement.  See, e.g., Cal. v. Acevedo, 500 U.S. 565, 574-81 (1991); United States v. Ross, 456 U.S. 798, 823 (1982).

9

is being committed." Brinegar v. United States, 338 U.S. 160, 175-76 (1979) (internal quotation and citation omitted). Courts use a "totality of the circumstances" approach to determine whether probable cause existed. Ill. v. Gates, 462 U.S. 213, 230-31 (1983). Here, setting aside the issue of whether the furtive movements observed by Officer Rogers when he first stopped the car and the information provided over the dispatch about an earlier tip that defendant was in possession of a firearm provided probable cause to open and search the locked glove box, the discovery of the plastic baggie corner with a white powder residue coupled with the narcotics dog's "alert" on the glove box provided the necessary probable cause. Officer Lane's testimony established that Blitz is trained in detecting narcotics, undergoes annual certification testing, and is "almost perfect" in terms of detecting narcotics. See Ill. v. Caballes, 543 U.S. 405, 409-10 (2005) (holding that "the use of a well-trained narcotics-detection dog — one that does not expose non-contraband items that otherwise would remain hidden from public view . . . — during a lawful traffic stop, generally does not implicate legitimate privacy interests," finding "[t]his conclusion is entirely consistent with our recent decision that the use of a thermal-imaging device to detect the growth of marijuana in a home constituted an unlawful search [because] [c]ritical to that decision was the fact that the device was

10

capable of detecting lawful activity in that case," whereas "a canine sniff by a well-trained narcotics-detection dog . . . discloses only the presence or absence of narcotics, a contraband item") (internal quotations omitted). Thus, taken together, this information would justify an officer in reasonably concluding that narcotics were contained in the glove compartment.[2]

Accordingly, because each step of police conduct was justified (the stop by the traffic infraction, the initial search of the car by defendant's consent, and the search of the glove compartment based on probable cause to believe that the compartment contained narcotics based on the narcotics dog alert), suppression of the seized firearm is unwarranted.

**III. Statements**

As to the incriminating statements concerning his purchase and possession of the seized firearm made by the defendant on March 2, 2007, defendant contends that they "were clearly the

---

[2] Defendant's contention that "[i]t is pure sophistry to suggest that the dog's training also included sensitivity to guns and gunpowder as there was no reaction to the many armed officers on the scene," Def. Mem. at 4, is inapposite inasmuch as the dog's reaction provided probable cause to believe that the glove compartment contained narcotics, thus justifying the search, even though the glove compartment search subsequently revealed a firearm, rather than narcotics (although, as Officer Lane testified, it is possible that Blitz was alerting on the presence of a trace of narcotics in the glove compartment). Moreover, because these circumstances are sufficient for a finding of probable cause, the Court need not assess the defendant's arguments concerning the reliability, for probable cause purposes, of the anonymous tip about defendant's firearm possession.

11

product of trickery and deception" inasmuch as "[d]efendant and his attorney relied on the alleged representation that the meeting was 'off the record'" and "[t]he lack of any advice pursuant to Miranda v. Arizona, 384 U.S. 436 (1966), although perhaps not required since defendant had made his bond and therefore was not in custody, nonetheless served to lull him into a false sense of security." Def. Mem. at 5. Defendant further argues that "[s]urely Mr. Basilica, an experienced criminal attorney, would not have let his client speak if he believed [d]efendant's statements could later have been used against him." Id.

Notwithstanding defendant's conclusory allegations about "trickery and deception," he offers no evidence that he and his attorney were told that the conversation would be "off the record," and Agent Prather testified that no one present at the interview made this statement to defendant, nor was any proffer agreement entered into with defendant. Moreover, as the defendant had been released on bond and was thus not "in custody," the officers were not required to read defendant his Miranda warnings. See United States v. Wallace, 178 Fed. Appx. 76, 79-80 (2d Cir. 2006) ("Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.' A defendant is not deemed to have been 'in custody' where, as here, there was 'no indication that

the questioning took place in a context where [defendant's] freedom to depart was restricted in any way.'") (citing Or. v. Mathiason, 429 U.S. 492, 495 (1977), and Cal. v. Beheler, 463 U.S. 1121, 1125 (1983)). There is no evidence that the officers treatment of the defendant otherwise constituted "trickery and deception" as claimed. Further, defendant's contention that his attorney would not have let his client speak if he believed the defendant's statements could later be used against him is circular; in fact, rather than counseling in favor of suppression, the fact that defendant's attorney was present at the meeting supports the conclusion that defendant's statements were knowing and voluntary.[3]

Accordingly, on this record, there is no basis justifying suppression of defendant's statements, and thus defendant's Motion on this issue must also be denied.

---

[3] Defendant's additional argument that "[i]f it is determined that the firearm was the product of an invalid search, then there was no basis for [d]efendant's arrest and his statements to state and local authorities 3 days later must fall as the fruit of the poisonous tree" is moot given the Court's conclusion supra that the search that uncovered the firearm was lawful.

**IV. Conclusion**

For the foregoing reasons, defendant's Motion to Suppress Evidence [Doc. # 13] is DENIED.

IT IS SO ORDERED.

/s/
Janet Bond Arterton
United States District Judge

**Dated at New Haven, Connecticut this 12th day of September, 2007.**